IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC VON POOLE                           *

   Petitioner                            *

    v.                                 *            Civil Action No. AMD-08-1918

                              *

JON WOLFE and
DOUGLAS GANSLER                          *

   Respondents                           *
                              ***

## MEMORANDUM

This state habeas action requires no hearing for resolution. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2008); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). The petition shall be dismissed for the reasons set forth herein.

Background

Evidence at Trial

Brian Johnson's body was found by Baltimore City Department of Public Works employees near the pumping station at Leakin Park on June 10, 2001. Tony Williams, a Department of Public Works employee, testified he was working the 11:00 pm to 7:00 am shift that evening and, as a part of his job, had to check on the pumping stations.  Paper No. 10 at Ex. 2, pp. 175-84. Williams and a co-worker were driving down South Chelsea Drive when they saw a body. The two men drove past the body to the bottom of a hill to insure no one was still there and turned around to investigate. Williams testified they could tell the man was dead "because

we seen blood just running down." *Id*. at p. 178.   After getting out of the truck and confirming

their suspicions, Williams said he and his supervisor, Anthony Rossi, called the incident in over

their radio, drove back to the gate, locked it, and called 911. Rossi also testified that the area

where the body was found was secluded and the road leading there would be easy to miss to

someone unfamiliar with the area.  *Id*. at p. 188.

Detective Nevins was the primary investigator and testified at trial.  Paper No. 10 at Ex.

2, pp. 211-28.  She testified that she received a call from her dispatcher at midnight concerning a

shooting that occurred in the 3400 block of Winterbourne Road, which she described as a

secluded area.  She testified that two shell casings were found at the scene and she was able to

obtain a tentative identification of the victim through use of a Polaroid picture. A preliminary

identification was made by one Damon Green, and a positive identification was made through

use of fingerprints.

Green testified that he saw the decedent talking to three men standing by a Jeep Cherokee

near the Amoco station at the intersection of Forest Park Drive and Windsor Mill Road. Paper

No. 10 at Ex. 2, pp. 229-58.  Green said he recognized one of the men talking to Johnson as a

man he knew as Charles and with whom he worked at Wendy's.[1]  Green further stated that after

he observed Johnson talking to the men, he was later informed that Johnson had been forced into

a car and driven away.  Green reported this to the police when he saw an officer questioning

someone driving another Jeep Cherokee that did not match the one driven by petitioner.

Antoine Lester testified that he was with petitioner and four other men, Joseph Hamm,

Carl Harrison, Gregory Veale and Leon Wilkerson, robbing people on the night Johnson was

killed.  Paper No. 10 at Ex. 2, pp. 261-322; Ex. 3, pp. 330-70.   He stated all of the men were

---

[1]During redirect, Antoine Lester explained that Jason Hamm is also known as Charles Hamm and
recognized Green when he saw him near the Amoco station.  Paper No. 10 at Ex. 3, p. 362.

armed and that petitioner frequently carried a nine millimeter.  Lester claimed petitioner called him on his cell phone and told him to go to the Amoco station because there were drug dealers there to rob. Lester and Veale were traveling together in Lester's car, a Toyota Corolla, and the remaining four men were traveling together in a gray Jeep Cherokee which petitioner had rented.

Once Lester and Veale arrived at the Amoco station, Harrison and Hamm got out of petitioner's vehicle, grabbed Johnson, threw him into the Jeep, and drove off.  Lester testified that he did not agree with taking Johnson away and could not understand what was going on, but followed the Jeep in his car.  He claimed that he and Veale used a cell phone to call the men in the other car to ask why Johnson was taken and what was going on.   Lester and Veale were told the men were taking Johnson to his house where he had money. Instead of driving to a residential area, however, petitioner drove the Jeep into a wooded area, Leakin Park, stopped the car, removed Johnson from the car, and said he had to be killed because he had seen petitioner's face.  Lester testified he saw petitioner attempt to shoot Johnson twice but the gun did not fire.  A discussion took place between Lester, petitioner and the other men in an attempt to convince petitioner not to kill Johnson.  Lester stated that during the conversation Johnson was on his knees, begging not to be killed.

Lester further testified that petitioner and Harrison threw Johnson back into the Jeep and drove to another area of the park that was secluded and accessed by a curving, one-way road.  He stated the two cars were briefly separated by another car, but Lester and Veale continued to call via cell phone and believed, based on the screams he heard over the phone, that Johnson was being beaten. When the Jeep stopped,  Lester saw petitioner drag Johnson out of the car and force him to kneel on the ground; he then heard two gunshots.

3

Both cars left the area. Lester seperated from the rest of the group and picked up his girlfriend and daughter.  He drove to a Wendy's restaurant with his girlfriend and daughter to meet the other men and split the robbery proceeds after arranging the meeting with petitioner on the phone.  Lester recalled that petitioner joked and bragged with the others about having killed Johnson and only getting "three bags of weed" out of it. Lester testified that he also met with petitioner later the next morning at a car wash because he said he had something for him. Petitioner was with three women when they met and he explained to Lester that he had crashed his car while racing it.

Cicely Sampson, Antoine Lester's girlfriend, testified and confirmed Lester's account of picking her up at his mother's house along with his 12-year-old daughter on the evening of June 10, 2001.  Paper No. 10 at Ex. 3, pp. 380-88.  She stated that they returned home around 11:00 in the evening and that Lester left, stating he could not sleep and was going to a Narcotics Anonymous meeting.  *Id*. at p. 385.  Sampson also testified that she accompanied Lester to the Westside Shopping Center where he parked the car and spoke with some men she did not recognize. *Id*. at pp. 386-87.  On cross-examination Sampson was asked if she or Lester were promised anything in exchange for their testimony, but was not permitted to answer the question over the state's objection. *Id*. at p. 388.

Gregory Veale took the stand and testified that on the night in question he was riding in the car with Antoine Lester.  Paper No. 10 at Ex. 3, pp. 399-434.  He said he saw Harrison grab Johnson by the ankles, Hamm hit him in the back, and the two of them put Johnson into petitioner's Jeep Cherokee.  *Id*. at p. 405. At the time Johnson was put into the car, Veale claimed petitioner was in the store buying cigars, but later admitted that petitioner did not allow Johnson to leave the car.  *Id*. at 430.  Veale testified that he got back into the car with Lester and

they followed the Jeep.  He also claimed that phone calls were made to the Jeep and both he and Lester told them to let Johnson go. He stated that the Jeep stopped at one point, petitioner dragged the victim out of the car, and he could see Johnson clutching his hand over his face.  He said he could not hear what was going on because he did not exit the car.

Veale also witnessed the second stop at Winterbourne Road when petitioner again dragged the victim from the car.  He explained that Lester's car was some distance away, down a small hill, with the headlights pointing into the woods.  He further stated that the headlights of the Jeep were pointing towards him.  He saw petitioner dragging Johnson by the collar from the vehicle, across the front of the car through the beam of the headlights, and heard two gunshots. He stated he could tell it was petitioner because he was the largest of the men who were in the car.  Veale testified that based on what he saw, he knew Johnson was dead.

Veale also corroborated Lester's testimony regarding the meeting at the Westside Shopping Center to divide the money from the robberies. *Id*. at p. 427. He claimed petitioner stated that the men should "just keep this between us."  *Id*. at p. 416.  On cross-examination Veale was asked if he was testifying  in return for a favor from the state or as a favor to Lester and he answered no to both questions.  *Id*. at p. 429-30.

Leon Wilkerson, who was riding in the Jeep Cherokee with petitioner on the evening of the murder, also testified.  Paper No. 10 at Ex. 3, pp. 461-93.  He claimed that he and Hamm also told petitioner they should let Johnson go.  Wilkerson said Harrison threatened them. *Id*. at p. 464. Wilkerson claimed the first time the Jeep stopped, petitioner asked Johnson to get out because he wanted to talk to him, then both men returned moments later.  *Id*. at p. 465.  He said he did not know what occurred outside of the truck during the first stop because he did not get out.  *Id*. at p. 475.  Wilkerson claimed petitioner did not have a gun with him the first time he got

out of the Jeep to talk to Johnson.  *Id*. The second time the vehicle stopped, Wilkerson testified, petitioner said he was going to let Johnson go, but Harrison told him he should not do that because Johnson had seen their faces.  *Id*. at p. 466.  Petitioner, Johnson and Harrison got out  of the vehicle; petitioner walked past the front of the car. Wilkerson heard two gunshots and petitioner and Harrison returned to the vehicle. Wilkerson recalled that petitioner repeatedly said to Harrison, "see what you made  do?" upon returning to the Jeep.  *Id*.  at 466.

When all the men met to split the robbery proceeds, Wilkerson testified, petitioner told all of them that he did not want to hear about what happened any more and that "its dead right here."  *Id*.  at p. 467.  Wilkerson then left with Lester.  On cross-examination Wilkerson denied being promised anything in exchange for his testimony or testifying to help Lester.  *Id.* at 489-90.

Detective Barry Grant was one of the detectives Antoine Lester spoke to about the murder.  Paper No. 10 at Ex. 4. pp. 513-30.  He testified that Lester had been arrested during his late night and early morning shift on June 12 and 13, 2001.  He recalled that Lester had been arrested on two unrelated shootings and, during questioning, revealed that he witnessed the "entire murder" of Brian Johnson and that he was incensed about it. *Id*. at p. 515.  Upon further discussion with Lester, the detectives convinced him to contact all of the people involved in the murder and set up a "hold up."  *Id*. at p. 515.  Lester called Harrison and Hamm, told them he had "a fat target they wanted to hit," and asked if they had guns.  *Id*.

Grant, along with Detective Jefferson, drove Lester to the meeting place.  The Quick Response Team was also notified. When the suspects were spotted on South Mount Street, the team moved in and made the arrests.  *Id*. at p.518-20.  Grant explained that Lester was on the phone with Hamm and Harrison when they were en route to help locate where the men could be

found. *Id.*  Grant recalled that Harrison ran past their car and he chased after him, capturing him about 30 feet from the corner. On cross examination Grant denied offering Lester anything in exchange for his help with the Johnson murder. *Id*. at p. 526-28.  He explained that he asked Lester why he was coming forward and Lester insisted that he was upset about hearing Johnson plead for his life. *Id*.  Grant testified that Lester was adamant about witnessing the whole murder and being upset by it.

Forensic evidence gathered from the Jeep driven on the night of the murder was introduced through Detective Blaine Vucci who processed it for fingerprints, and Roy Jones who identified the latent fingerprints collected.  Paper No. 10 at Ex. 4, pp. 531-34; 535-48.  It was established that the only identifiable fingerprints collected from the outside of the Jeep belonged to petitioner. *Id*. at pp. 538; 546-47.  With respect to the nine millimeter shell casings recovered at the murder scene, James Wagster of the Baltimore City Police Crime Lab testified that both casings had been fired from the same gun, but that the gun used was not available during his analysis.  *Id*. at pp. 562-69.

The manager for the Enterprise Leasing Company, Jonathan Glazer, testified as to the lease agreement signed by petitioner for the Jeep Cherokee.  Paper No. 10 at Ex. 4, p. 548-61. He stated that the Jeep was rented by petitioner on June 2, 2001, and was returned to the agency on June 11, 2001, after it was involved in an accident. *Id*. at p. 553.  He further testified that the initial rental agreement included information regarding the fact that the car was being rented because petitioner's 1997 Nissan Maxima had been involved in an accident. *Id*. Glazer also testified that when the Jeep was returned petitioner picked up a GMC Yukon which was returned to the agency with the windows broken and covered in black powder.

Detective Nevins subpoenaed employment records from the Wendy's and identified Charles Hamm as one of Green's coworkers. *Id* at pp. 574-75. She further testified that the investigation into murder continued through Tuesday, June 12, 2001, when she received a phone call from Detective Pennington regarding Antoine Lester's claim of having witnessed the Winterbourne Road murder. *Id*. at p. 578. Lester waived his *Miranda* rights and identified all of the men who were present during the murder, but only knew the full name for petitioner. *Id*. Lester identified petitioner in a photo array and provided a statement that he was the person who "killed an innocent boy." *Id*. at p. 584. During the interview with Lester, Detective Nevins testified that his phone kept ringing and he kept talking to the people who called him. She stated that Lester then offered to help bring the people involved in the murder into custody. Nevins explained that Lester's offer was accepted because they were unsure whether sufficient information regarding the true identity of all of the parties could be obtained. *Id*. at p. 586. Finally, Nevins stated that none of the witnesses she interviewed, including Gregory Veal, Leon Wilkerson, Antoine Lester, Charles Hamm, and Damon Green, asked for anything in exchange for the information they provided. *Id*. at pp. 599-600.

The defense called two witnesses. The first witness was Yvonne Anderson Holt, petitioner's mother. Paper No. 10 at Ex. 4, pp. 624-36. Holt testified that she saw her son on June 10, 2001, at her daughter's house in Glen Burnie, Maryland, for her grandson's birthday party. She claims he arrived around 8:30 that evening and called her to tell her he noticed her car, which was in the parking lot, had a flat tire. *Id*. She further stated that she spoke with petitioner later that evening when she called him to say she had arrived home safely. *Id*.

Tenecha Nicole Dorsey also testified for the defense. Paper No. 10 at Ex. 4, pp. 636-51. She stated that she was with petitioner on the evening of June 10, 2001, beginning around 11:00

p.m.  She claimed petitioner called her at her father's house, a claim verified by phone records showing a call to her father's number from petitioner's cell at 10:25 p.m.. *Id*. at p. 642.  She stated that she was riding in petitioner's rented car when he had an accident involving her sister's car.  *Id*. at p. 644.  Dorsey further testified that petitioner called the police regarding the car accident, a call which was also verified through phone records to have been made at 11:51 p.m. *Id*. at p. 649.  Under cross-examination Dorsey admitted that her name did not appear as a witness on any of the accident reports, but claimed she had provided her name and address to police officers who came to the scene of the accident. *Id*. at 644-45.

Although defense counsel requested a jury instruction regarding witnesses being promised leniency, the trial court denied the request because "you couldn't get anybody to generate that."  Paper No. 10 at Ex. 4, p. 662.  The jury found petitioner guilty of felony murder, aiding and abetting first-degree murder, kidnapping, robbery, first-degree assault, use of a handgun in the course of a felony, carrying a concealed weapon and carrying a weapon openly. He was sentenced to life imprisonment plus 50 years consecutive.[2]

## Appellate and Post-Conviction Review

On direct appeal petitioner alleged: the trial court erred by failing to give a jury instruction on accomplice testimony; the court erred by giving an instruction on aiding and abetting; and the evidence was insufficient to sustain the convictions.  Paper No. 10 at Ex. 8. The Maryland Court of Special Appeals affirmed the convictions, finding that the accomplice instruction was not requested and, therefore, the failure to provide it was not error; notwithstanding Lester, Veal and Wilkerson's accomplice status the evidence was sufficient to

---

[2]Carl Harrison and Charles Hamm were also convicted of murdering Brian Johnson.  *See Harrison v. State*, No. 2148, September Term, 2002 (February 11, 2004); *Adams v. State*, 165 Md. App. 352, 371, 885 A. 2d 833, 844 (2005) (referencing conviction of Poole, Harrison and Hamm in connection with the murder of Johnson); *see also* Paper No. 10 at Ex. 28, p. 1, fn 1.

sustain the convictions; and the aiding and abetting instruction was proper based on the evidence presented at trial.  *Id*. at Ex. 10.

While petitioner's appeal was pending, defense counsel for petitioner and two co-defendants received a letter from prosecutor Cynthia Jones regarding a letter written by Wilkerson to his defense attorney.  Paper No. 10 at Ex. 13.  The letter expressed Wilkerson's belief that "[t]he case that starts on the 7th of next month is the only case that the deal was suppose to be made with or for."  *Id*. Wilkerson sought clarification because "[t]he case on the 16th of next month was only to assure me a bail" and he was unsure about it because he "really didn't eyewitness him do anything."  *Id*.  He concludes with the request that counsel contact both states attorneys to "let them know my deal was only made to testify in the case on the 7th for both of my charges to be drop (sic)."  *Id*.  Jones forwarded the letter to counsel, explaining that the letter was brought to her attention at a staff meeting and that she discussed with her colleague whether any state agent made an agreement with Wilkerson in exchange for his testimony.  *Id*. at Ex. 17, p. 4.   Based on this information, petitioner filed a motion for new trial, alleging that the state had suppressed evidence that Wilkerson's testimony was provided in exchange for favorable treatment in pending criminal cases.  *Id*. at Ex. 10.  Petitioner also alleged that the state's attorney knew Wilkerson provided perjured testimony when he denied being promised anything in exchange for his testimony.  *Id*.

The trial court denied the motion for new trial without a hearing. Paper No. 10 at Ex. 17. Petitioner appealed the denial to the Maryland Court of Special Appeals which affirmed the denial in an unreported decision.  The appellate court noted that the alleged agreement was not newly discovered evidence which could not have been discovered by due diligence earlier and, if known, may have produced a different result.  *Id*. at p. 9.  The court also noted that neither the

letter to counsel from Jones nor the letter from Wilkerson to his attorney clearly established that a deal was consummated.  *Id*. at p. 7. The Court of Appeals denied petitioner's request for further review of the matter.  *Id*. at Ex. 18 and 19.

In his petition for state post-conviction relief, petitioner alleged that trial counsel was ineffective for failing to: investigate the scene of the shooting; object to portions of a witness's testimony regarding other criminal conduct; request a jury instruction on the testimony of accomplices; impeach the testimony of Lester, Veale and Wilkerson with past criminal convictions; and impeach the testimony of Lester through use of letters he wrote to Detective Nevins offering his assistance. Paper No. 10 at Ex. 20-24.  Petitioner also alleged the state knowingly used perjured testimony through Wilkerson and failed to disclose *Brady* material pertaining to Wilkerson's testimony and pending criminal charges.  *Id*.

At a hearing on the post-conviction claims, Cynthia Jones testified that she never offered Wilkerson lenient treatment on pending criminal charges in exchange for his testimony. Paper No. 10 at Ex. 23 at pp. 64-71.  She testified that she never made any deals with witnesses in exchange for their testimony because she felt it was their obligation to testify.  *Id*.  She explained she notified the attorneys because they needed to know what was going on and she never told any judge that Wilkerson cooperated in petitioner's case.

Wilkerson was not called as a witness at the post-conviction hearing, nor was petitioner's trial counsel. The transcript from Wilkerson's guilty plea was introduced in support of petitioner's allegation that there was a deal made for his testimony.  Paper No. 10 at Ex. 23, p. 77.  In the course of that proceeding there was a discussion regarding the reason for Wilkerson's confinement to protective custody in the Harford County Detention Center.  There had been threats made and the belief was that if Wilkerson was not kept where he was until petitioner's

trial was over he may be injured or killed. An agreement was reached that Wilkerson would plead guilty, wait to be sentenced after he testified, and would be sentenced to time served.  In addition, the judge agreed to contact the Parole Commission on Wilkerson's behalf.

The post-conviction court denied relief in a memorandum opinion and order dated June 30, 2005. Paper No. 10 at Ex. 24. Petitioner appealed the decision to the Court of Special Appeals which affirmed the post-conviction court's decision in a 77-page opinion on August 1, 2007. *Id*. at Ex. 28. A petition for writ of certiorari was denied by the Maryland Court of Appeals. The decisions of the post-conviction court and the Court of Special Appeals are discussed in further detail *infra*.

Allegations in this Court

Petitioner claims he is entitled to habeas corpus relief because the state failed to disclose *Brady* material regarding Wilkerson's testimony and trial counsel was ineffective for failing to impeach Lester with letters he had written to Detective Nevins.  Paper No. 1 at pp. 5 and 6.

Analysis

I.

Respondents assert the petition is untimely under 28 U.S.C. §2244(d)(1).  Paper No. 10 at pp. 13-15. Petitioner was found guilty on July 16, 2002. He was sentenced on October 1, 2002. The Court of Special Appeals affirmed the judgment on October 3, 2003.  On December 19, 2003, the Maryland Court of Appeals denied a petition for certiorari. Accordingly, for purposes of the filing deadline for federal habeas review, petitioner's conviction was final on March 18, 2004, the deadline for filing for certiorari review before the United States Supreme Court.[3]  On

---

[3]The court declines to determine whether the filing deadline was tolled during the period of time petitioner's motion for new trial was pending because the instant petition was timely filed without taking that period of time into account.

October 27, 2004, petitioner filed for post-conviction relief in the Circuit Court for Baltimore City, thereby tolling the limitations period for filing a federal habeas corpus petition with 142 days remaining on the one-year limitation period.

Post-conviction relief was denied by the Circuit Court on June 20, 2005.  The decision was affirmed on appeal by the Court of Special Appeals on August 1, 2007, and certiorari review was denied on December 7, 2007.  The time period for seeking certiorari review in the United States Supreme Court expired on March 6, 2008.  To calculate the filing deadline for the instant petition the period of time remaining on the one-year limitation period at the time it was tolled must be added to the date further appellate review was no longer available.[4]  When 142 days is added to March 6, 2008, the filing deadline is July 28, 2008.[5]  The instant petition was filed on July 22, 2008 and is timely.

II.

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[4]Counsel's method of simply adding the time periods when there was no pending litigation in the case is improper and leads to the erroneous conclusion that the petition is untimely.

[5]The actual deadline falls on July 26, 2008, which is a Saturday.

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).[6] Section 2254(d) also requires federal courts to give great deference to a state court's factual findings. *See Lenz v. Washington,* 444 F. 3d 295, 299 (4th Cir. 2006). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). With these standards in mind, the court will address the merits of petitioner's claims below.

## III.

### *Brady* Claim

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is

---

[6]Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985).  In order to prevail on a *Brady* claim, it must be established that the evidence at issue was both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial.  *Id*. at 678.  The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).  There is no requirement that the guilty finding be overturned unless suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

Petitioner's *Brady* claim centers on Wilkerson and whether he had an agreement with the state pertaining to his trial testimony, and, if so, whether the state failed to disclose the agreement to the defense.  Wilkerson also testified in another murder trial, unrelated to the Johnson murder, and a similar claim was raised by the defendant in that case.  *See Adams v. State*, 165 Md. App. 352, 885 A. 2d 833 (2005).  Both claims relied heavily upon the seemingly favorable treatment Wilkerson received in two pending cases, including a drug distribution charge and a violation of probation. Adams' *Brady* claim was raised in a motion for new trial which was rejected by the trial court after a hearing and the decision was affirmed by the Court of Special Appeals.  The analysis of Adams's claim was relied upon heavily by the appellate court in its decision in petitioner's case.  Paper No. 10 at Ex. 28.

In the *Adams* motion hearing the State's Attorney, Melissa Copeland, who prosecuted Wilkerson, testified that she was not aware of any agreement for lenient treatment in exchange for his testimony. Wilkerson also testified in relevant part that: he expected lenient treatment in his pending criminal cases in exchange for his testimony in both the Adams and Poole cases; he

15

was never promised anything by any prosecutor involved in either case but assumed he would be

treated favorably because of statements made by the police; and no one ever said anything to him

about a deal in the Poole case. *Id.* at pp. 24-26.  Wilkerson did not testify at petitioner's post-

conviction hearing, but the Court of Special Appeals reviewed the factual findings of the lower

court in the *Adams* case in addition to the conclusions made in petitioner's case.  *Id.* at pp. 19-34.

In rejecting Adams' motion for a new trial, the lower court concluded in part that

> At the time of the negotiation with Leon Wilkerson before Judge McCurdy, State's Attorney Copeland believed Leon Wilkerson had testified in the murder cases without the promise of any deal from the State.

> State's Attorney Copeland made the decision to offer Leon Wilkerson a sentence of time served for his two cases and pending violations of probation because the original offer by another prosecutor in Case # 10114014 had been two years, she felt neither of her cases were compelling, and she was inexperienced and believed including the violation of probations in the deal was the accepted procedure.

> State's Attorney Copeland's offer was not the result of any offer made by any prosecutor to Leon Wilkerson or any suggestion from any prosecutor to State's Attorney Copeland that leniency would be appropriate.

Paper No. 10 at Ex. 28, p. 34, *citing Adams*, 165 Md. App. at 412.

    In petitioner's post-conviction proceeding the state's attorney assigned to his case,

Cynthia Jones, testified that when she met with Wilkerson he was in jail and she knew he had

felony drug charges pending against him.  She further stated that it was her policy not to offer

witnesses anything in exchange for their testimony and that it had been her experience that

witnesses are sometimes misled to believe they would receive lenient treatment by "individuals

involved in the criminal justice system" before they are ever seen by representatives of the

state's attorney's office.  She also testified that she did not contact the judge in Wilkerson's case

after he had testified against petitioner and that Wilkerson never asked her for a deal nor did he express confusion over whether he would receive favorable treatment.

In rejecting petitioner's claim that the state knowingly introduced perjured testimony, the post-conviction court found that there was "no evidence that Leon Wilkerson intended to falsely testify about any deals made" and there was no evidence in the transcript of Wilkerson's guilty plea that the agreement was the result of his involvement as a witness in petitioner's case.  The post-conviction court concluded that petitioner failed to establish his claim concerning perjured testimony and failed to establish his *Brady* claim as there was no evidence of an agreement.

In reviewing the post-conviction court's decision, the appellate court noted that while it was not bound by its decision in *Adams*, the case was instructive.  The post-conviction judge's findings in *Adams* rejected the claim that there was a formal contractual arrangement made with Wilkerson, and also rejected the claim of an implied understanding.  The appellate court noted the fact-finding of the *Adams* post-conviction court that:

> The facts simply do not bear out the defendant's conclusion that Mr. Wilkerson must have had an agreement with the State in exchange for his testimony in the instant case.  The most that can be said is that Mr. Wilkerson formed a subjective expectation that he would be granted leniency in exchange for his testimony in this and another homicide case.

Paper No. 10 at Ex. 28, p. 59.  The appellate court then adopted the reasoning of the *Adams* court and concluded that the post-conviction court in petitioner's case was not clearly erroneous in its finding that Wilkerson did not enter into a deal with the state.  *Id*. at p. 64.  Absent an agreement for leniency, there was no duty to disclose under *Brady*.

Petitioner asserts that the post-conviction court erred in finding there was no evidence of an agreement between the state and Wilkerson because evidence to that effect was introduced.

17

Paper No. 1 at Memorandum, p. 13.  He relies on the guilty plea transcript in Wilkerson's case which took place on June 19, 2002, less than a month before Wilkerson testified against petitioner.  *Id*. at pp. 14-16.  On July 11, 2002, Wilkerson testified against petitioner; on July 15, 2002, Wilkerson was sentenced.  At the sentencing proceeding Wilkerson's counsel informed the court that his client had testified for the state against petitioner.  Counsel told the judge "this is the case where he was to testify, and he did, I understand.  I talked to the detectives. The detectives talked to the State's Attorney.  He did very well."  *Id*. at Ex. 2, p. 4.  Wilkerson was then sentenced in a manner that did not require him to serve additional jail time.

Petitioner also relies on Wilkerson's testimony at the hearing on the motion for new trial in the *Adams* case, wherein Wilkerson expressed his belief that a deal was being worked out between his attorney and the state's attorney in exchange for his testimony in both cases.  *Id*. at Ex. 3.  From these proceedings petitioner argues that it was clear that Wilkerson received a benefit from the state for his testimony and that "everyone at those hearings . . . understood Wilkerson would receive a benefit for cooperating with the State."  *Id*. at p. 19.  Petitioner assigns error to the post-conviction judge's conclusion that "the Court does not see any evidence in the transcript that this plea agreement was a direct result of his involvement in petitioner's case. And, petitioner did not call Judge McCurdy [Wilkerson's sentencing judge] or Mr. Wilkerson as witnesses . . . to testify otherwise."  *Id*. at p. 13.

Whether there was an agreement made with Wilkerson in exchange for his testimony in petitioner's case is a finding of fact which may not be overturned by this court unless it is objectively unreasonable in light of the evidence presented. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This court concludes that the evidence as outlined by the appellate court supports the conclusion that there was no agreement reached with Wilkerson in exchange for his

testimony and that finding is not objectively unreasonable.  While there was some evidence that

Wilkerson may have been the recipient of some vague promises of favorable treatment by police

officers or persons who were not authorized to make a binding agreement with him, there was

also evidence that no agreement was ever consummated.  In any event, this court agrees with the

state courts that the weight of the evidence favored a finding that no agreement was reached with

Wilkerson for his testimony.

Ineffective Assistance of Counsel Claim

To establish ineffective assistance of counsel petitioner must show both that counsel's

performance was deficient and that the deficient performance prejudiced his defense.  *See*

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The second prong requires the court to

consider whether there was "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different."  *Id.* at 694.  A strong presumption of

adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective

assistance of counsel must show that the proceeding was rendered fundamentally unfair by

counsel's affirmative omissions or errors.  *Id.*  at 696.

Petitioner asserts trial counsel was ineffective because he failed to use two letters written

by Antoine Lester to Detective Nevins as impeachment evidence.  In those two letters, which

were obtained by the defense during discovery, Lester stated:

> If you will help me in my [plight] for freedom; I can as[s]ure you
> that you'll get the people [you think are] behind the new [madness]
> in Baltimore City.  I would love to help better my city.  I have an
> int[e]rest in ap[p]rehending these people that do not care about
> another human beings (sic) life.

Paper No. 10 at Ex.24, pp 14-15.   In his second note to the detective Lester wrote, "You

kn[o]w my work.  I'm from the streets. With your authority and my street knowledge we can

19

make Baltimore's crime rate decrease." *Id*. The post-conviction court rejected this claim because Lester "made no specific reference to Petitioner's case in any of his correspondence.  Instead, he offers his general street knowledge, in exchange for his freedom or his bail lowered."  Paper No. 10 at Ex. 24, p. 15.  The appellate court agreed with the post-conviction court's analysis, holding that the lower court's factual findings were not clearly erroneous.  *Id*. at Ex. 28, p. 71.   The court further found that counsel's performance did not undermine the adversarial process because "Nevins clearly testified that she had not made any promises to the witnesses during the course of her investigation, and further stated that 'none of the witnesses asked for anything' in exchange for their cooperation." *Id*. at p. 72. The court concluded that even if counsel's performance was deficient, "the circumstances here do not warrant a reversal." *Id.*

Petitioner asserts that the failure to impeach Lester with the letters he had written was deficient performance which adversely effected the outcome of the trial.  He asserts that since Lester claimed he was testifying against petitioner because he was shocked by the nature of the crime and was there due to his outrage, the letters written by him seeking freedom for information contradicted those claims. Paper No. 1, Memorandum at p. 26.  To find that the state courts' conclusion that petitioner was not prejudiced by counsel's non-use of the two letters was unreasonable, this court would have to disregard other evidence used to impeach Lester's testimony, to say nothing of the overwhelming evidence of petitioner's involvement in the murder.  Lester admitted he was involved in robbing drug dealers, admitted he was in custody on other charges when he agreed to help police apprehend Johnson's killers, and admitted having witnessed other shootings.   To the extent that the letters to Detective Nevins would have established that he had other motives to assist the state in prosecuting petitioner, that evidence was already before the jury.  Thus, the state courts' conclusions withstand scrutiny.

<u>Conclusion</u>

The court determines for the reasons set forth above that petitioner is not entitled to federal habeas relief.  Accordingly, the petition shall be dismissed with prejudice. An order follows.

Date:  October 7, 2009                                   __/s/_____
                                                                          Andre M. Davis
                                                                          United States District Judge